UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
MICHAEL ROBINSON,

                Plaintiff,              MEMORANDUM AND ORDER
                                    15-CV-0988 (DRH) (AKT)

       -against-

UNITED STATES OF AMERICA,

                Defendant.
-------------------------------X
A P P E A R A N C E S:

For the Plaintiff:
    David A. Bythewood, Esq.
    85 Willis Avenue, Suite J
    Mineola, New York 11501
       By: David A. Bythewood, Esq.

For the Defendant:
     Richard Donoghue, United States Attorney for the
       Eastern District of New York
     610 Federal Plaza
     Central Islip, New York 11722
      By: Diane C. Leonardo, Esq., Assistant U.S. Attorney
         Josephine M. Vella, Esq., Assistant U.S. Attorney

HURLEY, Senior District Judge

      Michael Robinson ("Robinson" or "Plaintiff") filed the

present action against the United States of America (the

"Government" or "Defendant") pursuant to the Federal Tort Claims

Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*  Plaintiff alleges that

he was falsely arrested and imprisoned by the Department of

Homeland Security ("DHS"), and Immigration and Customs

Enforcement ("ICE").  He further claims to have been denied the

benefits of lawful permanent resident status and United States

citizenship by Defendant's negligence.

A bench trial was held on April 12 and 13, 2017 before United States Senior District Judge Leonard D. Wexler. The case was re-assigned to this Court on April 11, 2018. I conducted a telephone conference on April 19, 2018 to discuss whether either party wished to recall any witnesses pursuant to Rule 63 of the Federal Rules of Civil Procedure. Both parties stated that they did not want to recall witnesses and that the present record is sufficient. Upon review of the record, I certify familiarity with it, and determine that the case may be completed without prejudice to the parties based on the present record. Accordingly, the purpose of this decision is to provide my Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52.

## Format of Decision

By way of format, a brief, largely undisputed, overview of the interactions between Robinson and the government officials will be provided, followed by the contentions of the parties and the applicable law. Against that backdrop, detailed findings of fact on contested issues will be furnished along with concomitant conclusions of law.

## Part I – Undisputed Facts

1.      Robinson was born in Jamaica on November 6, 1990. (Def. Ex A-000104.)[1]  On May 3, 1997, he legally entered

---

[1] References to the evidence are to the trial transcript of proceedings held on April 12 and 13, 2017 ("Tr."), Plaintiff's exhibits ("Pl. Ex.") and Defendant's exhibits ("Def. Ex.").

the United States on a B-2 non-immigrant visitor visa. (Def. Ex. A-000001.)

2.   On August 13, 1998, an Application Form I-485 to adjust Robinson's status to lawful permanent resident was filed on his behalf by his stepmother (the "1998 Adjustment Application). (Pl. Ex. 23A; Tr. at 62:13-64:3.) Plaintiff, who was seven years old at the time, did not know anything about this application. (Tr. at 41:12-15.)

3.   By Memorandum of Creation of Record of Lawful Permanent Residence approved on October 12, 2001 and bearing File No. A 75 555 590, Robinson's status was adjusted from B-2 to lawful permanent resident (the "2001 Adjustment Approval"). (Pl. Ex. 24.)

4.   Robinson did not know the application had been approved and did not receive a green card as a result of the approval. (Tr. at 10:8-15, 43:15-18, 71:18-23.)

5.    Robinson's father, Desmond Robinson, became a naturalized United States citizen on September 29, 2005. (Def. Ex. A-000040.)

6.   A second Application Form I-485 for adjustment to permanent resident status, was filed on Robinson's behalf by his father on October 27, 2005 (the "2005 Adjustment Application"). (Pl. Ex. 18; Tr. at 65:8-13.) The 2005 Adjustment Application was assigned the file number A 96706661. (Pl. Ex. 18.)

7.   From July 19, 2006 to February 21, 2008,

Robinson's then-attorneys, Spar and Bernstein, P.C., wrote thirteen letters inquiring about the status of the 2005 Adjustment Application. (Pl. Exs. 3-15.) Each letter referred in the heading to File No.: 096-706-661, and each letter, in sum and substance, stated that Robinson and his father had appeared for an interview on May 15, 2006, and that at that time, "you indicated to us that you only had Michael's T file and that A file was at the National Records Center. You indicated that you would be requesting the A file and consolidating them and then approve the case." (Pl. Ex. 3.) The letters do not reference a second file number.

8. The second Form I-485 was approved on February 17, 2009. (Pl. Ex. 18.) Robinson received a green card in 2009. (Tr. at 47:4-6.)

9. On February 17, 2009, Robinson signed a document "voluntarily and willfully" requesting a withdrawal of the 1998 Adjustment Application for the stated reason that his father had "divorced petitioner Bernice E. Robinson, on 1/5/2001(the "Withdrawl Form"). (Def. Ex. N)[2]  The Withdrawal Form bears only file number A096706661.

10. On October 20, 2010, Robinson was convicted of three counts of burglary in the second degree, Class C felonies under New York Penal Law, and sentenced to three and one-half

---

[2] The parties' dispute regarding the significance of this document will be discussed further <u>infra</u>.

years' imprisonment.   (Tr. at 11:1-13, 13:3-6.)

11.   Robinson served the state sentence for the felony convictions in state custody from October 2010 to September 27, 2013.[3]  (Tr. at 13:3-12.)

12.   Robinson's case was referred to ICE by the New York State Department of Corrections to determine alienage and removability from the United States.  (Tr. at 106:23–107:15.)

13.   Prior to interviewing Robinson, ICE Deportation Officer Eddie Santiago ("Santiago") reviewed a Presentence Investigation Report that listed Robinson's citizenship as "Jamaican," status as "Legal Alien," and indicated that his immigration number was A096706661. (Tr. at 110:2-13; Def. Ex. A-000192.)

14.   During an interview on November 29, 2010, Robinson told Santiago that he was a citizen of Jamaica and a lawful permanent resident of the United States.  (Tr. at 16:3-20; Def. Ex. C.)

15.   ICE officers use a database, the Central Index System ("CIS"), to review files.  The database is maintained by United States Citizenship and Immigration Services ("USCIS"), a separate agency in the DHS.  (Tr. 111:12-25, 157:22-158:4.)

---

[3] There is a minor discrepancy in the record about the date of Robinson's transfer from state to ICE custody.  He testified that it occurred on September 28, 2013 while ICE witnesses and documentation indicate that it happened on September 27, 2013. (Def. Ex. A-000243) The Court will use the date set forth in the documentary evidence, September 27, 2013.

16.    Santiago used the CIS database to search for
Robinson's file using the A number 096706661.  (Tr. at 111:9-
13.)  He found the file, which indicated that Robinson was not a
United States citizen. (Tr. at 112:3-6.)

17.    Santiago testified that the database showed that
Robinson became a lawful permanent resident in 2009 after he had
turned 18 and thus he could not derive citizenship from a
parent.  (Tr. at 128:7-14).

18.    Santiago testified that he had never seen the
2001 Adjustment Approval. (Tr. at 122-12-15.)  At the time, he
was unaware that there was another A file for Plaintiff.  (Tr.
at 130:16-17.)

19.    Based on his database search, interview of
Robinson, review of the files of both Plaintiff and his father,
and state court records, Santiago determined that Robinson was
deportable as a noncitizen and turned his files over to his
supervisor for further action.  (Tr. at 117:14-22.)

20.    Robinson's case was assigned to ICE Deportation
Officer Anthony Zito ("Zito") for preparation of the necessary
paperwork to commence removal proceedings.  (Tr. 152:20-153:1.)

21.    Zito was only familiar with Robinson's alien
number A096706661 and never saw file A75555590.  (Tr. at 172:21-
173:10; 176:1-2.)

22.    Based on his review of the A file A096706661,
Zito did not find any indication that Robinson had a claim to

derivative citizenship.  (Tr. at 163:5-8.)  Zito testified that the 2001 Adjustment Application was not in the file when he made the removal determination.  (Tr. at 167:21-23.)

23.  Zito prepared a Notice to Appear ("NTA") for removal proceedings and forwarded it to his supervisor and ICE attorneys for approval.  (Tr. at 160:1-12.)

24.  An NTA for removal proceedings dated April 21, 2011 was served on Robinson on May 4, 2011. (Tr. at 19:8; Def. Ex. D.)  The NTA charged that Plaintiff was a citizen of Jamaica and subject to removal due to his felony convictions. (Def. Ex. D.)

25.  At the removal proceeding on October 12, 2011, Robinson testified that that he was a citizen of Jamaica (Tr. at 20:24-21:1.), and that he became a lawful permanent resident of the United States in February 2009. (Tr. at 22:10-13.)

26.  By Order dated October 12, 2011, Robinson was ordered removed to Germany or, in the alternative, to Jamaica. (Def. Ex. F.)

27.  Robinson did not appeal the removal decision by the Immigration Judge.  (Tr. at 22:20-21.)

28.  On June 24, 2013, Robinson moved to reopen the removal proceeding; the motion was denied on August 12, 2013 (Def. Ex. H; Def. Ex. A-000002.)

29.  Robinson's sworn affidavit dated June 24, 2013 and made in support of the motion to reopen the removal

proceeding, stated his belief that he is a citizen of Jamaica and that his status was adjusted to lawful permanent resident on February 17, 2009. (Def. Ex. H.; Tr. at 29:17-20.)

30. Robinson was released from State custody on September 27, 2013 and was transferred directly to an ICE detention center in Batavia, New York. (Tr. at 163:1-2.)

31. On October 4, 2013, ICE Deportation Officer Brent Stothers ("Stothers") took a sworn statement from Robinson, recording Robinson's answers as given. (Tr. at 190:2-20.) Robinson told Stothers that he was not claiming United States citizenship, said "I just want to be deported," and declined to answer further questions. (Def. Ex. J; Tr. 32:3-25, 33:1-1.)

32. On November 27, 2013, Robinson's new attorney, Millicent Y. Clarke ("Clarke"), filed a FOIA request on Robinson's behalf for records at the USCIS National Records Center for the stated purpose "[t]o determine whether I am in fact a United States citizen." (Def. Ex. K.; Tr. at 60:17-20.)

33. Clarke received the response to the FOIA request by CD received on February 17, 2014. (Tr. at 60:17-20.) Upon review of the file, Clarke saw that an application for adjustment to lawful permanent resident status had been filed in 1998 and that application had been approved; she found nothing in the file to indicate that a green card was issued at that time. (Tr. at 64:1-15)

34. Upon review of the file and discovering what she

believed to be evidence of citizenship, Clarke called the Chief Counsel in Buffalo. (Tr. at 61:22-24.)

35. On February 19, 2014, Robinson was released from ICE custody. (Tr. at 9:12-14.)

36. On February 26, 2014, DHS filed a motion with the immigration court to reopen the removal proceeding and dismiss the order of removal. (Pl. Ex. 1.) The motion stated that "unbeknownst" to DHS or Robinson, Robinson "had acquired lawful permanent resident status under alien number A75-555-590 on October 12, 2001" prior to his eighteenth birthday and thus has "established a probative claim to derivation of United States citizenship." (Id.)

37. By two Orders dated March 11, 2014, the Immigration Judge granted DHS's motion to reopen the removal proceeding, and terminated the proceedings without prejudice. (Pl. Ex. 26; Pl. Ex. 27.)

38. On June 3, 2014, Robinson's attorney submitted an Application for a Certificate of Citizenship to USCIS. (Def. Ex. O.) USCIS received the application on June 5, 2014. (Id.)

39. A Certificate of Citizenship was issued on April 27, 2016 showing Robinson's United States citizenship effective September 29, 2005. (Pl. Ex. 00.) There is no longer any dispute that Robinson became a United States citizen by derivation at the same time as his father.

A.  Plaintiff's Position

        Plaintiff contends that his arrest and imprisonment
by the Government were unlawful and the result of negligence as
well as "other intentional factors."  He claims that due to the
government's negligence, he was denied the benefits and
privileges of a legal permanent citizen despite having attained
that status on October 21, 2001.  He further claims to have been
denied the rights and privileges of United States citizenship
despite having attained that status in 2005.  Plaintiff also
argues that the Defendant engaged in:  (1) a cover up and
conspiracy to cover up the fact that he had been a United States
citizen starting in 2005; (2) fraud by omission in not
disclosing "to the immigration court and others" that Plaintiff
had been a citizen starting in 2005; and (3) conspiracy to
commit fraud by omission.[4]

B.  Defendant's Position

        The Government argues that since the filing of the
NTA and removal proceeding occurred while Robinson was in state
custody, there is no period of detention in ICE custody that
would support a false arrest or false imprisonment claim.  It
argues alternatively that Plaintiff's detention was privileged.

---

[4] Plaintiff's complaint contained three causes of action:  false arrest
and false imprisonment, negligence, and negligent supervision.  There
were no fraud allegations or causes of action.

The Government further contends that to the extent Plaintiff is asserting a malicious prosecution claim, he is effectively challenging the removal proceeding and decision, and that this Court lacks jurisdiction over that decision.

As to the alleged negligence for failure to investigate Plaintiff's citizenship, the Government notes that there is no private analogue for such a claim and thus there can be no claim under the FTCA. The Government additionally argues that there was no evidence to support Plaintiff's claim of negligent supervision.

Finally, the Government argues that Plaintiff's claims are barred under 28 U.S.C. §2680(h) because Government employees involved in removal proceedings are not law enforcement officers within the meaning of the statute.

## Part III – Applicable Law

A.   Relevant Statutes

The requirements for derivative citizenship are set forth in 8 U.S.C. § 1431(a) and are as follows:

> A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled:
>
> (1)   At least one parent of the child is a citizen of the United States, whether by birth or naturalization.

> (2) The child is under the age of eighteen years.
>
> (3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.

8 U.S.C. §1431(a). Derivative citizenship is automatic provided all the conditions have been met. The child must have lawful permanent resident status prior to turning 18 years of age. See generally Moreira v. Sessions, 681 F. App'x 61, 63 (2d Cir. 2017) (summary order)(pending application to adjust status was insufficient to satisfy §1431(a) where admission was not actually granted until two months after applicant's eighteenth birthday).

An alien in the United States may be removed if he "is convicted of an aggravated felony at any time after admission. . ." 8 U.S.C. § 1227(a)(2)(A)(iii). The term "aggravated felony" includes a "burglary offense for which the term of imprisonment [is] at least one year." 8 U.S.C. § 1101 (a)(43)(G). Once an alien has been ordered removed, the removal shall take place during a 90-day "removal period," which is triggered by the latest of three events including "the date the alien is released from detention or confinement" if that alien is otherwise detained or confined. 8 U.S.C. §1231(a)(1)(B)(iii). The statute requires that the alien be detained during the removal period, and if the alien was determined to be deportable under specific statutes, including §1227(a)(2), he may be

released "[u]nder no circumstance." 8 U.S.C. §1231(a)(2).

Pursuant to §1232(g), "no court shall have jurisdiction to hear

any cause or claim by or on behalf of any alien arising from the

decision or action by the Attorney General to commence

proceedings, adjudicate cases, or execute removal orders against

any alien under this chapter." 8 U.S.C. §1252(g).

B.    FTCA Claims

        The FTCA constitutes a limited waiver of sovereign

immunity by the United States and permits a tort suit against it

under specified circumstances.  Liranzo v. United States, 690

F.3d 78, 85 (2d Cir. 2012). Relevant to this case, the FTCA

specifically waives sovereign immunity for claims of false

imprisonment, false arrest, and malicious prosecution "with

regard to acts or omissions of investigative or law enforcement

officers of the United States." 28 U.S.C. §2680(h).

"Investigative or law enforcement officer" is defined, for

purpose of this subsection, as "any officer of the United States

who is empowered by law to execute searches, to seize evidence,

or to make arrests for violations of Federal law." Id.  In this

Circuit, immigration agents are "'investigative or law

enforcement officers' within the meaning of this section."

Caban v. United States, 728 F.2d 68, 70 (2d Cir. 1984).

        The FTCA also sets forth a discretionary function

exception to the waiver of sovereign immunity.  See 28 U.S.C.

§2680(a) (barring liability for "[a]ny claim . . . based upon

13

the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency . . . whether or not the discretion involved be abused"); see also Reichhart v. United States, 408 F. App'x 441, 443 (2d Cir. 2011) (internal quotation marks and citation omitted) (the waiver of federal sovereign immunity "does not encompass actions based upon the performance of, or failure to perform, discretionary functions"). The exception bars suit "only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy analysis." Coulthurst v. United States, 214 F.3d 106, 109 (2d Cir. 2000) (citing United States v. Gaubert, 499 U.S. 315, 322–23, 111 S.Ct. 1267, 113 L. Ed. 2d 335 (1991); Berkovitz v. United States, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L. Ed. 2d 531 (1988)). "Neither the Second Circuit nor the United States Supreme Court has explicitly answered whether the United States or a plaintiff bears the ultimate burden of proving the applicability of the discretionary function exception." Ruiz ex rel. E.R. v. United States, 2014 WL 4662241, at *4, n.5 (E.D.N.Y. Sept. 18, 2014).

Sovereign immunity is only waived "under circumstances where the United States, if a private person,

would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §1346(b)(1). Accordingly, "the FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees." Liranzo, 690 F.3d at 86 (citing FDIC v. Meyer, 510 U.S. 471, 478, 114 S. Ct. 996, 127 L. Ed. 2d 308) (1994)).

For liability under the FTCA to arise, a "plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred, and his allegations, taken as true, must satisfy the necessary elements of that comparable state cause of action." Peker v. Steglich, 324 F. App'x 38, 39 (2d Cir. 2009) (quoting Chen v. United States, 854 F.2d 622, 626 (2d Cir. 1988)(internal quotation marks and citations omitted)); see also Fanning v. Nat'l Grid/KeySpan, 649 F. App'x 48, 49 (2d Cir. 2016) (summary order) (noting that the FTCA "does not create a cause of action against private entities; it simply waives the federal government's sovereign immunity for torts committed by its employees in circumstances in which a private individual would be liable."). If there is no private analogue to a plaintiff's claim, dismissal for lack of subject matter jurisdiction is warranted. See Liranzo, 690 F.3d at 83.

As the conduct complained of occurred in New York, the Court applies that state's law to its liability

15

determinations.[5]  The plaintiff bears the burden to prove all

elements of his claims by a preponderance of the evidence.  <u>See</u>,

<u>e.g.</u>, <u>Wright v. United States</u>, 2017 WL 3142041, at *12 (E.D.N.Y.

July 24, 2017) (burden of proof on negligence claims);

<u>Richardson v. City of New York</u>, 2006 WL 2792768, at *3 (Sept.

27, 2006) (burden of proof on false arrest claims).

C.    <u>False Arrest, False Imprisonment</u>

New York law governs claims of false arrest and false

imprisonment brought pursuant to the FTCA.  <u>See</u> 28 U.S.C.

§1346(b); <u>Caban v. United States</u>, 728 F.2d 68, 72 (2d Cir.

1984).  In New York, claims of false arrest and false

imprisonment are synonymous.  <u>See</u> <u>Liranzo</u>, 690 F.3d at 91 n.13

(<u>citing</u> <u>Posr v. Doherty</u>, 944 F.2d 91, 96 (2d Cir. 1991)).  To

prevail on a claim of false imprisonment, a plaintiff must prove

that: "(1) the defendant intended to confine [the plaintiff],

(2) the plaintiff was conscious of the confinement, (3) the

plaintiff did not consent to the confinement and (4) the

confinement was not otherwise privileged." <u>McGowan v. United</u>

<u>States</u>, 825 F.3d 118, 126 (2d Cir. 2016) (<u>quoting</u> <u>Broughton v.</u>

<u>State</u>, 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 314

(1975)).  To be otherwise privileged, "the actions of the

immigration officer must be reasonable and the detention must be

---

[5] Some of Plaintiff's claims implicate the treatment of his A files and essentially his entire immigration history.  As Plaintiff resided in New York throughout his time in the United States and as the parties have not suggested that application of the law of another jurisdiction is appropriate, the Court will apply New York law to all claims.

conducted in accordance with federal standards." Polanco v.
United States, 2014 WL 795659, at *4 (E.D.N.Y. Feb. 27, 2014).

The Second Circuit recently issued a decision in a
case discussing many of the same issues as those raised here.
See Watson v. United States, 865 F.3d 123, 131 (2d Cir. 2017).
The plaintiff in that case, who consistently claimed that he was
a United States citizen, was held in immigration custody for
three and one-half years "on the mistaken belief that he was a
deportable alien." Id. at 126. After his release and the
adjustment of his status, Watson commenced a claim under the
FTCA for false imprisonment, malicious prosecution, negligent
investigation into his citizenship status, and negligent failure
to timely deliver a certificate of citizenship.

The Watson court, noting the clear distinction
between the separate torts of false imprisonment and malicious
prosecution, observed that "false imprisonment is characterized
by 'detention *without legal process*,' while malicious
prosecution involves detention from '*wrongful institution* of
legal process.'" Watson, 865 F.3d at 131 (quoting Wallace v.
Kato, 549 U.S. 384, 389-90, 127 S. Ct. 1091, 166 L. Ed. 2d 973
(2007)) (emphasis in original). In other words, "false
imprisonment ends once the victim becomes held pursuant to
[legal] process." Wallace, 549 U.S. at 389. Notably, the
Second Circuit found that plaintiff was "certainly held pursuant

to [legal] process by the time an immigration judge ordered
[his] removal." Watson, 865 F.3d at 131. Accordingly, any
alleged false imprisonment ends when a removal proceeding has
been held and a removal order issued.

To prove a malicious prosecution claim under New York
law, a plaintiff must prove "(1) the initiation of a proceeding,
(2) its termination favorably to plaintiff, (3) lack of probable
cause, and (4) malice." Watson, 865 F.3d at 134 (quoting Savino
v. City of New York, 331 F.3d 53, 72 (2d Cir. 2003)). "To prove
malice, a plaintiff must show that the defendant acted in bad
faith, i.e., on the basis of a 'wrong or improper motive,
something other than a desire to see the ends of justice
served.'" Watson, 865 F.3d at 134 (quoting Torres v. Jones, 26
N.Y.3d 742, 761, 47 N.E.3d 747 (2016) (internal quotation marks
and citation omitted)). Any claim to challenge the commencement
of removal proceedings is jurisdictionally barred by 8 U.S.C.
§1252(g). See Reno v. Am.-Arab Anti-Discrimination Comm., 525
U.S. 471, 487, 119 S. Ct. 936, 142 L. Ed. 2d 940 (1999).

D. Negligence, Negligent Supervision

To establish a negligence claim under New York law, a
plaintiff must prove (1) a duty owed to the plaintiff by the
defendant, (2) breach of that duty, and (3) the breach was a
proximate cause of the injury to plaintiff as a result of that
breach, the plaintiff was injured. See Di Benedetto v. Pan Am

18

<u>World Servs., Inc.</u>, 359 F.3d 627, 630 (2d Cir. 2004). There is, however, no cause of action under New York law "'for false arrest or false imprisonment sounding in negligence.'" <u>Barone v. United States</u>, 2014 WL 4467780, at *8 (S.D.N.Y. Sept. 10, 2014) (<u>quoting</u> <u>Swinton v. City of New York</u>, 61 A.D.3d 557, 558, 877 N.Y.S.2d 68, 70 (1st Dep't 2009)). Thus to the extent a FTCA claim of false arrest or false imprisonment relies on a theory of negligence not recognized under New York law, "that claim is not subject to the FTCA's general waiver of immunity" and this court lacks subject matter jurisdiction to entertain it. <u>Barone</u>, 2014 WL 4467780, at *8.

A plaintiff must establish that there is a causal nexus between his injuries and the alleged breach of duty by defendant. Although a defendant "is liable for all normal and foreseeable consequences of its acts, an intervening act will constitute a superseding cause and will serve to relieve a defendant of liability when the act is of such an extraordinary nature or so attenuated from the defendant's conduct that responsibility for the injury should not reasonably be attributed to the defendant." <u>Clark v. New York City Hous. Auth.</u>, 277 A.D.2d 338, 339, 717 N.Y.S.2d 216, 217 (2000). "When a question of proximate cause involves an intervening act, 'liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the

defendant's negligence.'" Hain v. Jamison, 28 N.Y.3d 524, 529, 46 N.Y.S.3d 502 (2016) (quoting Mazella v. Beals, 27 N.Y.3d 694, 706, 37 N.Y.S.3d 46 (2016)); see also Delano v. United States, 859 F. Supp. 2d 487, 504 (W.D.N.Y. 2012) (noting that "a plaintiff's 'reckless and unforeseeable' actions may sever the causal connection between the defendant's conduct and the plaintiff's injuries." (quoting Tryon v. Square D Co., 275 A.D.2d 567, 568-69, 712 N.Y.S.2d 676, 678 (3d Dep't 2000))).

New York does not recognize a causes of action for negligent investigation or prosecution. See Grennan v. Nassau Cnty., 2007 WL 952067, at *22 (E.D.N.Y. Mar. 29, 2007); Coleman v. Corporate Loss Prevention Assoc., Inc., 282 A.D.2d 703 (2d Dept. 2001); see also Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994) (noting that "[u]nder New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution."). Accordingly, any claim for negligent investigation fails as there is no private analogue for a such a claim in New York. Watson, 865 F.3d at 134-35.

To establish a claim of negligent supervision in New York, a plaintiff, in addition to the standard elements of negligence, must prove: "'(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's

propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels.'" Hwang v. Grace Rd. Church (in New York), 2016 WL 1060247, at *15 (E.D.N.Y. Mar. 14, 2016) (quoting Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (internal quotation marks and citations omitted)).  A negligent supervision claim must be dismissed where there is no showing that the defendant employer knew of its employee's tortious propensities, "or that there had been any indication that would have alerted the employer to the possibility of tortious conduct."  C.D. of NYC, Inc. v. U.S. Postal Serv., 2004 WL 2072032, at *5 (S.D.N.Y. Sept. 16, 2004), aff'd, 157 F. App'x 428 (2d Cir. 2005); see generally Naegele v. Archdiocese of New York, 39 A.D.3d 270, 270, 833 N.Y.S.2d 79 (1st Dep't 2007) (lack of evidence that a supervisor knew or should have known of an employee's "propensity to commit the tortious acts alleged ... negates the employer's liability as a matter of law."). New York does not recognize a claim for negligent supervision of law enforcement officers.  See Hicks v. City of Buffalo, 124 F. App'x 20, 25 (2d Cir. 2004) (citing Bernard, 25 F.3d at 102); Zaniewska v. City of New York, 2013 WL 3990751, at *10 (E.D.N.Y. Aug. 5, 2013) (citing Bernard, 25 F.3d at 102).

Part IV – Discussion and Concomitant
Findings of Fact on Disputed Issues[6]

40. Robinson was in state custody from October 2011 until his transfer into ICE custody in September 2013. During this time, Robinson's liberty was constrained not by ICE, but rather by New York State as a result of his felony convictions. Robinson has no claim of false arrest or false imprisonment against defendant for his confinement by the state.

41. The removal proceeding, which constitutes legal process, and issuance of the removal order occurred on October 12, 2011, while Robinson was still in state custody. Robinson's transfer to ICE custody in September 2013 and his subsequent detention were pursuant to legal process evidenced by that removal order. Thus, Robinson has no claim of false arrest or false imprisonment for his confinement by ICE.

42. Even if plaintiff had proved that he was confined by ICE for purposes of a false arrest or false imprisonment claim, the Court finds that the actions of the ICE officers were reasonable under the circumstances and therefore any confinement was privileged. Plaintiff's case was referred to ICE by the state for review based on his stated Jamaican citizenship.

---

[6] In this part of the decision, i.e., Part IV, Findings of Fact 40 through 66 are provided. The reader is reminded that Findings of Fact 1 through 39 are set forth in Part I, supra.

Robinson repeatedly and consistently claimed Jamaican citizenship throughout his exchanges with ICE officers and the immigration court. The ICE officers' review of Plaintiff's file, using the only A number available to them, confirmed Robinson's assertions of his status. Additionally, Robinson's confinement by ICE after the transfer from state custody was supported by a removal order issued by an Immigration Judge, and it was reasonable for the detaining officers to rely upon that order in continuing to confine Robinson pending his removal. In October 2013, Robinson continued to claim Jamaican citizenship as he had throughout. His first mention of the possibility that he may have a claim to derivative citizenship did not occur until November 2013 when he retained new counsel. In addition, the Court notes that ICE promptly released Robinson from its custody in February 2014 within two days after his attorney brought the existence of the 2001 adjustment of status to the attention of ICE attorneys. The Court finds that the officers acted reasonably throughout and that Plaintiff's detention was privileged.

43. Plaintiff did not plead a malicious prosecution claim in his complaint; to the extent Plaintiff's claim can be construed as one for malicious prosecution, however, it also fails. In the first instance, this Court lacks jurisdiction to affect the decision to commence removal proceedings against

Robinson by operation of 8 U.S.C. §1252(g).  Moreover, even if

the Court had jurisdiction to consider the claim, the record is

devoid of any evidence of malice or intent to harm Plaintiff on

the part of the ICE officers or any government actor at any

time.

44.  Plaintiff's negligence claims arise from three

circumstances – (a) ICE's failure to discover that he had a

claim to derivative citizenship, (b) the failure to timely issue

a certificate of citizenship, and (c) the treatment of his

immigration records prior to his arrest in 2010.[7]

45.  Plaintiff suggests that despite his assertions of

Jamaican citizenship, the ICE officers should have discovered

that he was entitled to derivative United States citizenship.

Any alleged negligence by the ICE officers in this regard is

properly characterized as a claim for negligent investigation.

As there is no private analogue for such a claim, it must be

dismissed.

46.  Plaintiff alleges negligence as a result of the

delay between his application for a certificate of citizenship

and issuance of that document.  He applied for the certificate

on June 3, 2014, and it was issued on April 27, 2016.  No

---

[7] Defendant did not assert a statute of limitations defense in its
answer, nor has it raised or briefed the issue here.  In the absence
of such arguments, the Court declines to sua sponte address either the
statute of limitations or the applicability of equitable tolling.

evidence was adduced at trial to support a finding that Defendant breached any duty to Plaintiff. He has failed to demonstrate that this delay was anything more than the passage of time necessary for the completion of bureaucratic functions. Furthermore, the record fails to provide any evidence, testimonial or documentary, of damages Plaintiff allegedly suffered during the delay. Accordingly, he has failed to satisfy his burden of establishing damages proximately caused by any breach in a duty of care.

47. Plaintiff's remaining claims concern the handling of the 1998 Adjustment Application and that application's approval in 2001, and the handling of the 2005 Adjustment Application and that application's approval in 2009.

48. As to the 1998 Adjustment Application and the 2001 Adjustment Approval, Plaintiff suggests that the wrongful denial of the rights and privileges associated with lawful permanent resident status starting from October 12, 2001, "appears to have been caused by negligence as opposed to an intentional act." (Pl. Findings of Fact at 4.)

49. Robinson was approximately seven years old when the first application to adjust his status was filed in 1998 by his stepmother, and almost eleven years old when it was approved in 2001. Given his tender age, Robinson's uncontroverted testimony that he, personally, was unaware of the application

and its resolution at the time is creditable. Robinson's testimony, however, is the only evidence offered by Plaintiff addressing these events. In effect, he is using his age as both a shield and a sword – as a young child, he cannot be expected to have known what was going on, yet his testimony regarding those events is the only evidence provided about those events.

50. Robinson's attorney, Clarke, testified that she found no evidence in the record that a green card had been issued in 2001. The trial exhibits, however, contain an approval letter dated November 26, 2001 stating that Robinson's application for lawful permanent resident status had been approved and directing him to appear on December 14, 2001 for processing and/or passport stamping. See Def. Ex. N. The letter also directs Robinson to provide additional documentation regarding his stepmother, Bernice Robinson. Id.

51. Plaintiff has not provided testimony or affidavit from either his father, Desmond, or his stepmother, Bernice, to confirm that they never received any notice of the approval. Was Desmond unaware of the 1998 application? Perhaps Robinson never knew about the 2001 approval because by the time it had been processed, Desmond and Bernice had divorced. Did Bernice receive the approval letter and keep its contents to herself? Or did she receive it and tell Desmond, who then failed to keep the appointment? These questions are, of course, merely

supposition and speculation, but are raised to make the point that Plaintiff had other sources of evidence to support his allegations. Plaintiff's testimony alone regarding what occurred from 1998 through 2001, when he was of tender age (viz., ages 7-11) is insufficient to satisfy his burden of proof that Defendant was negligent in the handling of the 2001 Adjustment Approval.

52. The 2005 Adjustment Application was filed by Desmond Robinson. In the space for A number, the word "None" was typed; the number A96706661 is handwritten in the box. See Pl. Ex. 18. This A number was assigned by Defendant when the application was received.

53. Plaintiff, in his proposed Findings of Fact and Conclusions of Law ("Pl. Findings of Fact"[8]), construes the events surrounding the 2005 Adjustment Application and the 2009 Adjustment Approval as constituting some type of intentional tort not found in his complaint. The relevant arguments raised by Plaintiff in his post-trial submissions are essentially speculative, conclusory, and unsupported by evidence admitted at the trial.

54. Regarding the letters written in the years 2006 through 28 by Plaintiff's attorneys, Spar and Berstein,

---

[8] The pages of Plaintiff's findings of fact are unnumbered. Citations to page numbers are to numbers supplied by the Court.

inquiring as to the status of Plaintiff's case and the
Defendant's lack of response, Plaintiff states that "[i]t is
believed that the defendant did not communicate with Spar and
Bernstein because it located [the October 12, 2001 Approval] and
did not wish to disclose the fact that the plaintiff. . .had
already been made a permanent resident years before and elected
to cover that permanent residency up rather than explain that
the plaintiff had been a permanent resident since 2001." (Pl.
Findings of Fact at 5.)  There is no citation to the record in
support of this speculation.  In addition, Plaintiff did not
call as witnesses either recipient of the letters, SDAO Auletta
and DAO Amarei.

  55. Plaintiff also claims that the 2001 Adjustment
Approval was in his file "even though it was hidden from certain
employees of the defendant for the distinct purpose of doing
damage to the plaintiff." (Pl. Findings of Fact at 6.)  There
is no citation to evidence to support a claim that the document
was selectively "hidden."

  56. The parties differ greatly on their
interpretation of the Withdrawal Form executed by Robinson on
February 17, 2009 which purported to withdraw the 1998
Adjustment Application.  Defendant cites it as evidence that
Robinson voluntarily withdrew the prior application and that he
knew as of that time that a prior application was made on his

behalf.  Plaintiff also conceded in February 2009, he was made
aware of a prior adjustment application made on his behalf.
(Tr. at 37:23-38:5)  He also conceded that he never said
anything to the immigration judge or ICE officers regarding the
prior application.  At another point in the questioning, he said
he did not understand that he was withdrawing a previous filing
but was merely complying with his parents' direction to sign the
document.  (Tr. at 36:4-15.)

57.  Plaintiff treats the Withdrawal Form as nothing
less than the smoking gun — "[t]he only inference that can be
drawn by [the Withdrawal Form] . . . is an intentional cover up
by the defendant" and "can only be looked upon as an intentional
tort event to cover up the fact that the plaintiff, Michael
Robinson[,] had already become a permanent resident in 2001."
(Pl. Findings of Fact at 6.)  Plaintiff relies upon the very
existence of the document as his evidence without citation to
other testimony or evidence.

58.  The Withdrawal Form alone does not constitute
evidence of negligence, let alone intentional tort.[9]  At most,
it evidences USCIS's awareness that the 1998 Adjustment
Application had been filed.  It does not necessarily follow that

---

[9] In addition to characterizing execution of the withdrawal as a cover
up and intentional tort, he further suggests that there may have been
mail or wire fraud under 18 U.S.C. §§1341 and 1343, as well as various
state crimes.  (Pl. Findings of Fact at 7.)  The Court finds no merit
in these allegations based on the record before it.

the USCIS employee processing the paperwork in 2009 was aware of the 2001 Adjustment Approval, much less that he or she consciously decided to use this form to cover up some mistake committed by someone, somewhere.

59. Plaintiff also argues that the Withdrawal Form had no validity since the application had already been granted and the only way to change that decision is through a recission procedure set forth in a USCIS field manual.  Failure to follow a procedure or agency rule "is merely evidence of negligence but does not establish negligence as a matter of law." McGowan v. United States, 825 F.3d 118, 218 (2d Cir. 2016) (quoting Chen v. United States, 854 F.2d 622, 627 (2d Cir. 1988)).

60. Beyond the existence of the Withdrawal Form, Plaintiff has provided no admissible evidence to support his claims.  Plaintiff carries the burden of proof by a preponderance of the evidence and the Withdrawal Form by itself does not suffice.  Absent from the record is any testimony or affidavit from the witness on the withdrawal form, S. Amariei, or from Desmond Robinson, who was apparently present at its execution.  Plaintiff's argument that that none of Defendant's witnesses testified about the withdrawal is unavailing. Plaintiff has the burden of proof and thus should have provided admissible evidence to support his claims.

61. The Court finds that Robinson has failed to carry

his burden of proof on his claims regarding the Defendant's handling of his immigration filings and thus judgment will be entered for Defendant.

62. To the extent Plaintiff's cover-up theory is a claim of negligent supervision, it too fails. He has not pointed to a tortfeasor, nor has he provided any evidence that a supervisor was aware, or should have been aware, of an employee's propensity for engaging in tortious conduct. The lack of proof of a supervisor's awareness of the employee's propensity is, by itself, fatal to Plaintiff's claim.

63. Plaintiff alleges fraud and/or fraud by omission for the first time in his proposed findings of fact. He has not formally moved to amend his complaint to conform to the evidence pursuant to Rule 15(b) of the Federal Rules of Civil Procedure. Construing his submission as such a motion, it is denied. The Court does not believe that the issue of fraud was "tried by the parties' express or implied consent," and thus application of Rule 15(b)(2) is not appropriate. A post-trial Rule 15(b) motion "may be granted if the party against whom the amendment is offered will not be prejudiced by the amendment and should be granted in the absence of such prejudice if the interests of justice so require." Hillburn by Hillburn v. Maher, 795 F.2d 252, 264 (2d Cir. 1986). Plaintiff's contentions regarding fraud pertain to the treatment of the 2005 Adjustment

Application and the "cover-up" regarding the existence of the 2001 Adjustment Approval. His complaint stated only negligence claims pertaining to those time periods. Additionally, it is unclear from the trial testimony that Plaintiff was alleging fraud. To allow amendment at this juncture would be prejudicial to Defendant.[10]

64. It is now undisputed that Robinson became a lawful permanent resident on October 12, 2001, and was entitled to derivative United States citizenship on September 29, 2005. It is also clear that the reason the ICE officers were unable to make this determination upon reviewing the records was that the available documents simply confirmed Robinson's assertions of Jamaican citizenship. For reasons still unexplained, it appears that the two A files were not merged in any way that allowed the ICE officers to view the 2001 Adjustment Approval. To the extent there was negligence, it occurred at some undetermined point in time prior to ICE's involvement.

---

[10] Even if the Court were to allow amendment, Robinson cannot prevail on the fraud claims. To establish a fraud claim in New York, a plaintiff "must show by clear and convincing evidence that the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 181 (2d Cir. 2007). To show fraud by omission, the plaintiff must also show that defendant "had a duty to disclose the concealed fact." Id. As he has failed to prove evidence of negligence by a preponderance of the evidence, he certainly has not met the higher burden of proof required to prove fraud.

65.    Viewing the entirety of the evidence at trial, it appears likely that Defendant failed to merge the two A files into a single file. To the extent this was a breach of duty owed to Plaintiff, he has failed to establish any facts about when or how this breach occurred.  Not only does this failure impact Plaintiff's ability to establish his claim, it also negatively affects the Defendant's ability to determine whether application of the discretionary function exception is warranted – without knowing what the "act" was, there is no way to determine whether it was discretionary.

66.    Even assuming that the record taken in total supports a finding that some government actor failed to properly merge the files, Plaintiff's claim faces a hurdle in establishing that the failure caused his harm.  Plaintiff alleges that as a result of the absence of the 2001 Adjustment Approval from his file, he was "compelled to undergo removal proceedings which led to an Order of removal." (Pl. Findings of Fact at 11.)  However, the absence of the approval form only became relevant when Robinson was arrested and convicted.  The commencement of the removal proceedings would not have occurred but for the intervening act of Plaintiff's crime.  It surely cannot be argued that it was foreseeable that Plaintiff would choose to commit a serious felony.  As such, Plaintiff's commission of a serious crime constitutes a superseding cause

relieving Defendant of liability.

<u>CONCLUSION</u>

   For the foregoing reasons, the Court concludes that Plaintiff has failed to establish by a preponderance of the evidence his claims against Defendant.

   The Clerk of the Court is directed to enter judgment for Defendant and close the case.

   SO ORDERED.

Dated: August 22, 2018
   Central Islip, New York


             _____
             DENIS R. HURLEY, U.S.D.J.